## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

NELSON BONILLA FRANCO,

**Plaintiff**

**v.**                                          **CIVIL NO.** 06-1781 (JAG)

GLAXOSMITHKLINE

**Defendant(s)**

### OPINION AND ORDER

GARCIA-GREGORY, D.J.

Pending before the Court is Glaxosmithkline's ("GSK") Motion for Summary Judgment, filed on January 14, 2008 (Docket No. 53). The Motion was referred to Magistrate Judge Marcos E. López for a Report and Recommendation. (Docket No. 70). The Magistrate Judge recommended that the Motion for Summary Judgment be **DENIED.** For the reasons set forth below, this Court **ADOPTS** the Magistrate Judge's Report and Recommendation.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Nelson Bonilla Franco was born on March 14, 1959 and was 47 years old when he filed this action. He started working at GSK on June 4, 1980, as a Pharmaceutical Operator. In or around 1984, he was promoted to the position of Laboratory Analyst. In or around 1989, he was promoted to the position of Manufacturing

Civil No. 06-1781 (JAG)                                              2

Supervisor. In or around 2001, he was promoted to Senior
Manufacturing Supervisor. (Docket No. 97-2, ¶ 2; Docket No. 141-1,
¶ 2). Jorge L. Soto Figueroa ("Soto Figueroa") who supervised
Plaintiff during 2004-2005 testified in his deposition that
Plaintiff was a trustworthy leader, was more knowledgeable than him
in the Tablets Area, never had complaints, nor any problem with
regard to his performance. (Docket No. 97, Exh. 5, pp. 28-30).
During the time he was employed at GSK he also received multiple
awards and recognitions. (Docket No. 97-2, Exhs. 7, 8).

On April 27, 2005, while Plaintiff was a Senior Manufacturing
Supervisor, a Consent Decree of Condemnation and Permanent
Injunction ("Consent Decree") was entered between the U.S. Food and
Drug Administration ("FDA") and GSK. By virtue of this Consent
Decree, certain drugs were seized under warrants of arrest *in rem*.
According to the FDA, the methods, facilities and controls used for
the manufacture, processing, packaging, and holding of certain
drugs did not comply with current regulations, as required by the
Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 351(a)(2)(B).

As a result of the Consent Decree, GSK entered into a process
of being constantly audited by the FDA. There were potential
penalties of ten thousand dollars ($10,000) in liquidated damages
for each day in violation of the Consent Decree. A maximum penalty
of ten million dollars ($10,000,000) in any one calendar year and
the possibility of plant closure. (Docket No. 53-3, ¶ 1-2; Docket

Civil No. 06-1781 (JAG)                                                3

No. 141-1, ¶ 9).

        As a consequence of the Consent Decree GSK increased its
employee's workload. For instance, the documentation
(observations, investigation reports and lot documents deviations)
was more extensive and had to be approved by a company named
Quantic. Quantic was the company agreed to between the FDA and GSK
to follow up on the correction of the deficiencies identified in
the Consent Decree.  The documentation had to be handed in by the
deadlines imposed by Quantic for its approval. (Docket No. 90, Exh.
12, pp. 28-34).

        Another consequence of the Consent Decree was that GSK adopted
a zero tolerance policy towards mistakes. For example, on January
24, 2006, GSK terminated José A. Soto ("Soto"), an Operational
Quality Technician. Soto, who was born in 1974, was fired because
he failed to comply with a "SOP requirement" (Standard Operating
Procedure requirement) in the entry of information into CAPAs
(Corrective Action Preventive Action).(Docket No. 90, Exh. 12, p.
28-34; Docket No. 53, Exh. 6, ¶¶ 3-6).

        Essentially, CAPAs main purpose was to aid GSK in preventing
errors from recurring. CAPAs were the product of investigations
conducted after variations in the manufacturing process occurred
(Docket No. 53-3, ¶ 4; Docket No. 97-2, ¶ 4, ¶ 11; Docket No. 141-
1, ¶ 11). CAPAs detailed the measures and actions to be taken by
GSK to fix a deviation and established a deadline for its

Civil No. 06-1781 (JAG)                                              4

completion. CAPAs were implemented through Technical Change
Requests ("TCRs"). (Docket No. 90, Exh. 12, pp. 37-41, 55-57;
Docket No. 90, Exh. 9, pp. 47-48; Docket No. 97-2, ¶ 12; Docket No.
141-1, ¶ 12).

As part of the many changes that took place after the Consent
Decree, GSK created Remediation Teams. These teams were responsible
for correcting all the deficiencies identified by the FDA. GSK
assigned experienced leaders to manage the Remediation Teams.
(Docket No. 53-3, ¶ 4; Docket No. 97-2, ¶ 3, ¶ 10; Docket No. 141-
1, ¶ 10). On November, 2005, Plaintiff was assigned as the leader
of a Manufacturing Remediation Team because of his experience and
expertise in the field. (Docket No. 53-3, ¶ 6; Docket No. 97-2, ¶
6). As part of his role in a Manufacturing Remediation Team,
Plaintiff supervised seven (7) persons and was responsible for the
decisions taken by the team. (Docket No. 53-3, ¶ 7; Docket No. 97-
2, ¶ 7). As a result of his assignment as leader of one of the
Remediation Teams, Plaintiff's work load was increased. He was
assigned approximately three hundred (300) CAPAs that were in
backlog since 2004. He was also assigned several TCRs. (Plaintiff's
depo. Docket No. 90, Exh. 12, pp. 113-115). On September 19, 2005,
he was assigned TCR 0473, which was due on September 2, 2005.  At
the time he was assigned TCR 0473 Plaintiff was supervised by
Josefina Vega ("Vega"), GSK's Manufacturing Manager. Vega reported
to Stephen Brandt ("Brandt"), Manufacturing Director, who in turn

Civil No. 06-1781 (JAG)                                          5

reported to Giuseppe Carloni ("Carloni"), Manufacturing Vice-President. (Docket No. 53-3, ¶ 8; Docket No. 97-2, ¶ 8).

On February 1, 2006, Brandt issued a warning to the Plaintiff. The warning stated, among other things, that on January 25, 2006, "it was discovered that Technical Request #0473 ('TCR 0473') had not been closed despite the CAPA commitment of September 2, 2005", and that Plaintiff's failure to complete TCR 0473 and his "lack of ownership and accountability for this critical CAPA implementation ha[d] put the site at risk." The warning also informed Plaintiff that all disciplinary actions against him were considered and that it had been decided that he was to be assigned to the position of Operation Support Group Leader reporting to María C. Grafals. The warning informed Plaintiff that he would be evaluated by Vega and Joaquin Villeta ("Villeta") every thirty days for a maximum of ninety days. If plaintiff's performance during the following two years fell below expectations, he would be "re-graded to the corresponding grade for ... [his] new job". He would maintain his grade level and benefits during the two years. (Docket No. 53, Exh. 9). Plaintiff was then placed on a probationary period. (Docket No. 53-3, ¶ 17; Docket No. 97-2, ¶ 17).

On February 13, 2006, while on probation, Plaintiff went on medical leave due to his mental and emotional condition. His doctor ordered Plaintiff to rest at home from February 12, 2006 to March 31, 2006. He also ordered Plaintiff to be hospitalized at San Juan

Civil No. 06-1781 (JAG)                                          6

Capestrano Hospital in order to receive treatment for his severe depression. (Docket 53-3, ¶ 18; Docket 97-2, ¶ 18, ¶ 49, ¶ 52; Docket No. 141-1, ¶ 49, ¶ 52).

On Sunday, March 5, 2006, and before his medical leave expired, Plaintiff entered GSK's premises. (Docket No. 53, Exh. 7, ¶ 9). Plaintiff's co-workers Hugo Orellano and Ivette Díaz were unaware of the nature of Plaintiff's absence and his sudden presence at the plant prompted them to call Vega to inform her of the situation. (Docket No. 53-3, ¶ 23; Docket No. 97-2, ¶ 23).

GSK conducted an investigation and found that the security video cameras at GSK had filmed Plaintiff entering GSK's premises empty handed and exiting them with what appeared to be a binder and several documents. (Docket No. 90-6; Docket No. 97, Exh. 1, ¶ 69). After the investigation Ervin Rodríguez, ("Rodríguez"), GSK's Human Resources Director, wrote an e-mail to Luisa C. Ruiz ("Ruiz"), Employee Relations Manager, informing her that Plaintiff had accessed the plant without authorization during his medical leave in violation of the policy that prohibits employees from entering the premises out of assigned shifts. GSK's policy regarding leave of absences required that employees on medical leave must pass through GSK's infirmary and obtain a certificate authorizing them to return to work. Plaintiff was aware of this policy. (Docket No. 90-8, p. 11; Docket No. 90-14). Ruiz was told that Plaintiff was already under a final warning due to performance issues and that

Civil No. 06-1781 (JAG)                                              7

there were witnesses and photographic evidence that confirmed that Plaintiff had removed documents from the plant. (Docket No. 53-3, ¶ 26). As a result, Graham Johnson (the plant's General Manager and President), Rodríguez and Carloni recommended the immediate termination of the Plaintiff's employment at GSK. (Docket No. 97-2, ¶ 26).

On March 16, 2006, Ruiz called Plaintiff. GSK alleges that the call was made to concert an appointment with the Plaintiff. (Docket No. 53-3, ¶ 27). However, Plaintiff alleges that Ruiz called to ask him to report back to work. (Docket 97-2, ¶ 26; Docket No. 97, Exh. 1, ¶ 72, ¶ 74). Plaintiff told Ruiz he was on medical leave and could not return to work. (Docket No. 53-3, ¶ 27).

On March 24, 2006, Plaintiff filed a discrimination charge before the Equal Employment Opportunity Commission ("EEOC"). (Docket No. 53, Exh. 22). Plaintiff alleges that on the same day he filed the EEOC claim he gave Brandt a copy. (Docket No. 97-3, ¶ 27). GSK alleges that it was only notified "on or after April 6." (Docket No. 53-3, ¶ 30). On April 5, 2006 Plaintiff was terminated. The termination letter said that the reason for his termination was that he had entered GSK's premises while on medical leave, without going through the return to work procedure, and removed materials and documentation without authorization. (Docket No. 53, Exh. 26).

Plaintiff contends that on two occasions at the end of 2005 or

Civil No. 06-1781 (JAG)                                              8

the beginning of 2006 he complained to Carloni about alleged
harassing and discriminatory comments made by Vega and Brandt about
his age. (Docket No. 90. Exh. 12, pp. 209-210). He also contends he
talked to Ruiz about the comments at the end of 2005. (Docket No.
90, Exh. 12, pp. 295-296). At all times he was aware that GSK had
an EEOC policy against age discrimination and retaliation which
establishes a written complaint mechanism.(Docket No. 53-3, ¶ 34;
Docket No. 97-2, ¶ 34)

     On August 9, 2006, Plaintiff filed this action against GSK.
Plaintiff's complaint avers the following: (1) GSK's actions
violated the Age Discrimination in Employment Act, 29 U.S.C. § 621
et seq. ("ADEA"); (2) that he suffered retaliation due to his
opposition to GSK's unlawful employment practices; and, (3) that he
has supplemental state law claims under Puerto Rico Law No. 100 of
June 30, 1959, 29 P.R. Laws Ann. § §146 et seq. (2006) ("Law 100");
Puerto Rico Law No. 115 of December 20, 1991, 29 P.R. Laws Ann. §
§194 et seq. (2006) ("Law 115"); Puerto Rico Law No. 80 of May 30,
1976, as amended, 29 P.R. Laws Ann. tit. §185a et seq. (2006) ("Law
80"); Puerto Rico Law No. 44 of June 2, 1985, as amended, 1 P.R.
Laws Ann. § 501 et seq. (2006) ("Law 44"); and, Article 1802 of the
Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141 (2006) ("Article
1802").

     On January 14, 2008, GSK filed the present motion for Summary
Judgment. Essentially the Motion requests: (1) the dismissal of

Civil No. 06-1781 (JAG)                                                    9

Plaintiff's ADEA discrimination claim for failure to prove the second prong (meeting job expectations) of the McDonnell Douglas burden shifting scheme for establishing a prima facie case. (Docket No. 53-2, p. 8); (2) the dismissal of the ADEA discrimination claim for failure to establish that the reasons given by GSK for the Plaintiff's termination were pretexts. (Docket No. 53-2, p. 22); (3) the dismissal of the ADEA hostile environment claim for failure to establish that the harassment was sufficiently severe and pervasive to alter the terms and conditions of his employment. (Docket No. 53-2, p. 14-19); (4) that GSK be allowed to use the Faragher/Ellerth defense against the hostile work environment claim. (Docket No. 53-2, p. 19); (5) the dismissal of Plaintiff's retaliation claim for failure to establish a causal nexus between a protected activity and the termination. (Docket No. 53, p. 27); and, (6) that this Court refrain from exercising supplemental jurisdiction over the state law claims. (Docket No. 53-2, p. 35).

      GSK's Motion for Summary Judgment was referred to the Magistrate Judge on February 25, 2008. (Docket No. 70). Plaintiff's opposition was filed on March 31, 2008. (Docket No. 97). GSK's reply was filed on July 18, 2008. (Docket No. 140). Plaintiff's sur-reply was filed on August 15, 2008. (Docket No. 159). On October 16, 2008 the Magistrate Judge issued a Report and Recommendation. (Docket No. 179).

      The Report and Recommendation advises this Court to DENY the

Civil No. 06-1781 (JAG)                                          10

Motion for Summary Judgment based on the following conclusions: (1)
Plaintiff met the second prong of the ADEA prima facie case because
he showed he fulfilled GSK's job expectations and there is an
absence in the record of a history of negative evaluations. (Docket
No. 179, p. 15); (2) Ageist remarks made by Plaintiff's superiors,
if found to be true, were severe enough and made frequently enough
so that a rational fact finder could sustain a claim for hostile
work environment. (Docket No. 179, p. 30); (3) The <u>Faragher</u>/<u>Ellerth</u>
defense to the hostile work environment claim is not available to
GSK because Plaintiff's termination is a tangible employment action
that precludes its availability. (Docket No. 179, p. 30);  (4) The
retaliation claim based on Plaintiff's oral complaints about the
comments made by his superiors presents a causal nexus with an
adverse employment action, which is sufficient to survive GSK's
Motion for Summary Judgment. (Docket No. 179, 36).


                          **STANDARD OF REVIEW**

1. <u>Summary Judgment Standard</u>

        The Court's discretion to grant summary judgment is governed
by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states,
in its pertinent part, that a court may grant summary judgment only
if "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) ( citing Fed.R.Civ.P. 56©).

In order for a factual controversy to prevent summary judgment, the dispute must be "genuine" and the contested facts must be "material". The issue is "genuine" if it can be resolved in favor of either party. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" if it has the potential of changing the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"In prospecting for genuine issues of material fact, we resolve all conflicts and draw all reasonable inferences in the nonmovant's favor." Viceberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008). Although this perspective is favorable to the nonmovant, once a properly supported motion has been presented before the Court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the denial of the motion for summary judgment. Anderson, 477 U.S. at 248. This is demonstrated through the "submissions of evidentiary quality." Iverson v. City of Boston, 452 F.3d 94, 98 (1 st Cir. 2006) (internal citations omitted). It may not be

Civil No. 06-1781 (JAG)                                              12

demonstrated by resting on "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (citing Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

    For issues where the opposing party bears the ultimate burden of proof, the party cannot merely rely on the absence of competent evidence, but must affirmatively point to the specific facts that demonstrate the existence of an authentic dispute. See Suarez v. Pueblo International, Inc., 229 F.3d 49, 52 (1st Cir. 2000). Furthermore, on issues "where the opposing party bears the burden of proof, it must 'present definite, competent evidence' from which a reasonable jury could find in its favor." United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (citing United States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992)).

    It is important to note that throughout this process, this Court cannot make credibility determinations, weigh the evidence, and make legitimate inferences from the facts for they are jury functions, not those of a judge. See Anderson, 477 U.S. at 225.


2. Standard for Reviewing a Magistrate Judge's Report and Recommendation

    Pursuant to 28 U.S.C. § 636(1)(B), Fed.R.Civ.P. 72(b) and Local Rule 503, a district court may refer dispositive motions to

Civil No. 06-1781 (JAG)                                              13

a United States Magistrate Judge for a Report and Recommendation.
See Alamo Rodríguez v. Pfizer Pharmaceuticals, Inc., 286 F.Supp.2d
144, 146 (D.P.R. 2003). The adversely affected party may "contest
the Magistrate Judge's report and recommendation by filing
objection 'within ten days of being served' with a copy of the
order." United States of America v. Mercado Pagán, 286 F.Supp. 2d
231, 233 (D.P.R.) (citing 287 U.S.C. § 636(b)(1)). If objections
are timely filed, the District Judge shall "make a de novo
determination of those portions of the report or specified findings
or recommendation to which [an] objection is made." Rivera-De-Lean
v. Maxon Eng'g Servs., 283 F. Supp. 2d 550, 555 (D.P.R. 2003). A
district court can "accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate," however,
if the affected party fails to timely file objections, the district
court can assume that they have agreed to the Magistrate Judge's
recommendation. Alamo Rodríguez, 286 F.Supp.2d at 146 (citing
Temeplemen v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir.
1985)).


                              **DISCUSSION**

     The following are GSK's objections to the Report and
Recommendation: (1) The Report and Recommendation erroneously
relied on the Plaintiff's affidavit. (Docket No. 186, pp. 1-9); (2)
The Report and Recommendation erroneously concluded that Plaintiff

Civil No. 06-1781 (JAG)                                              14

met the second prong of ADEA's prima facie case. (Docket No. 186,
p. 9); (3) The Report and Recommendation erroneously concluded that
there are genuine issues of material facts. (Docket No. 186, p. 9);
(4) The Report and Recommendation failed to apply and analyze the
correct pretext standard. (Docket No. 186, p. 11); (5) The Report
and Recommendation erroneously concluded that the hostile work
environment claim survived the Motion for Summary Judgment and that
the Faragher/Ellerth defense is not available to GSK. (Docket No.
186, p. 18); and, (6)The Report and Recommendation failed to
dismiss Plaintiff's retaliation claim. (Docket No. 186, p. 21).
GSK's objections will be addressed individually.


1.  The  Report  and  Recommendation  erroneously  relied  on  the
Plaintiff's affidavit

     GSK urges this Court to completely disregard the Plaintiff's
affidavit. It argues that Plaintiff only produced the affidavit
after he had the benefit of reviewing GSK's Motion for Summary
Judgment and that it is a "sham affidavit." (Docket No. 186, p. 2).
The Report and Recommendation disregarded the affidavit in three
instances because of unexplained inconsistencies  with the
deposition  testimony.  The  inconsistencies  in  the  Plaintiff's
affidavit are: (1) Plaintiff's statement denying that CAPAs had
deadlines (Docket No. 179, p. 4, note 3); (2) Plaintiff's statement
that the documentation related to the observations, investigation

Civil No. 06-1781 (JAG)                                        15

reports, lot documentation, deviations, and TCRs was not more extensive because of the Consent Decree (Docket No. 179, p. 5, note 4); and, (3) Plaintiff's statement that Quantic "was only a company which provided limited guidance on the correction of the deficiencies identified by the FDA in the Consent Decree" and that "Quantic never imposed any deadlines regarding TCRs or CAPAs". (Docket No. 179, p. 5, note 4); and, (4) Plaintiff's statement that no zero tolerance policy was adopted by GSK after the Consent Decree. (Docket No. 179, p. 5, note 5). GSK argues that the entire affidavit should have been stricken "in its entirety inasmuch as plaintiff should not benefit from the fruit of a poisonous tree." (Docket No. 186, p. 2). It contends that the affidavit's only purpose was to defeat its Motion for Summary Judgment. (Docket No. 186, p. 2).

The First Circuit, along with most other Circuits, has developed its own form of "sham affidavit" doctrine. It was first developed by the Second Circuit in Perma Research & Development Co. v. Singer Co., 410 F.2d 572 (2nd Cir. 1969). Within the First Circuit it is established that "[w]hen an interested party has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).

Civil No. 06-1781 (JAG)                                              16

The First Circuit has also said that the doctrine is, on the one hand, "a concern with the credibility of a later disavowal" and on the other, a matter of policy: "If prior statements under oath could be disavowed at will after a motion is made, the other side would be faced with a constantly moving target and summary dispositions made almost impossible." Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000). "Whether there is a contradiction and whether the explanation for it is satisfactory are both likely to depend very much on an assessment of the specific facts; and in such cases the district court's judgment is likely to be superior to that of a more remote appellate tribunal." Id. at 996 (citing United States v. Howard (In re Extradition of Howard), 996 F.2d 1320, 1327-28 (1st Cir. 1993). In sum, District courts are entitled to disregard portions of affidavits that include new information whenever said information was clearly asked for in previous questions. This Court, therefore, is not compelled to and will not strike Plaintiff's entire affidavit because of its unexplained inconsistencies.

This Court, however, cannot make credibility determinations, weigh the evidence, and make legitimate inferences from the facts since those are jury functions. Anderson, 477 U.S. at 225. The record as a whole indicates that there is a sufficient and material issue of fact regarding whether Plaintiff was discriminated against because of his age.

2. <u>The Report and Recommendation erroneously concluded that
Plaintiff met the second prong of the ADEA's prima facie case
requirement</u>

In an ADEA claim, when a plaintiff lacks direct evidence of
discrimination he or she must establish a <u>prima facie</u> case. In the
absence of direct evidence, the <u>prima facie</u> case is established
through the burden shifting method developed in <u>McDonnell Douglas
Corp. v. Green</u>, 411 U.S. 792 (1973). To establish a <u>prima facie</u>
case under ADEA, Plaintiff must show by a preponderance of the
evidence that: (1) He or she is over 40 years of age; (2) That his
or her job performance was satisfactory and met the employer's
legitimate expectations; (3) That he or she suffered an adverse
employment action; and, (4) That the defendant sought a replacement
with roughly equivalent job qualifications. <u>See</u> <u>Gonzalez v. El Dia,
Inc.</u>, 304 F.3d 63 (1st Cir. 2002). In its Motion for Summary
Judgment GSK concedes that Plaintiff meets the first, third and
fourth prong of the ADEA <u>prima facie</u> case, but denies that he met
the second prong. (Docket 53-2, pp. 8-9). In said Motion GSK argues
that Plaintiff failed to meet its job expectations because he did
not comply with his CAPA commitments and with the return to work
policy. In its Objections to the Report and Recommendation GSK
argues that what must be analyzed is the Plaintiff's performance at
the time of his termination and that his alleged prior performance
is irrelevant. (Docket No. 186, p. 9). GSK is wrong.

The Report and Recommendation found that Plaintiff met the second prong of the ADEA _prima_ _facie_ case. It concluded that the record reflects that Plaintiff met and even exceeded GSK's job expectations throughout his 26 year career there. (Docket No. 179, p. 15). The Report and Recommendation also points to the fact that there is a complete lack of evidence in the record as to any negative evaluations, except for the warning of February 1, 2006. (Docket No. 179, p. 14).

This Court concurs with the Report and Recommendation in finding that it is the history of employment as a whole, and not at the time of termination, what must be evaluated. A long history of promotions may be found, as here, to support a finding that a plaintiff met job expectations. See Mulero Rodriguez v. Ponte's, Inc., 98 F.3d 670, 673 (1996) (citing Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994)). See also Acevedo Martinez v. Coatings Inc. and Co., 251 F.Supp.2d 1058, 1067 (D.P.R. 2003); Alabarces v. Sabre Holding Corp., 2006 WL 2818976 (D.P.R. 2006).

Plaintiff started at GSK in 1980 as a Pharmaceutical Operator. He was promoted around 1984 to the position of Laboratory Analyst. Around 1989 he was promoted to the position of Manufacturing Supervisor. In or around 2001, he was promoted to Senior Manufacturing Supervisor. In November, 2005, he was put in charge of one of the Remediation in Teams created to comply with the

Civil No. 06-1781 (JAG)                                              19

Consent Decree. He also received positive evaluations for 2004 and
was given a 4.5% salary increase in April, 2005. On December 2,
2005 he received an e-mail from Carloni saying, "Nelson[:] great
job!! Keep focus for another week and we'll get where we want to
be..." (Docket 97, Exh. 8). The record also shows that in 2003 and
2005 Plaintiff received at least three awards and recognitions.
(Docket No. 97, Exh. 7, pp. 2-4, 6). It can be inferred from the
aforementioned history of promotions (along with a positive
evaluation, a recent raise, awards and recognitions and praises
from a supervisor), that Plaintiff in fact met his employer's job
expectations.

     GSK also alleges that the Report and Recommendation
erroneously relied on the complete absence in the record of a
pattern of negative evaluations to conclude that Plaintiff met
GSK's job expectations. (Docket No. 186, p. 9). GSK alleges that
the Report and Recommendation's conclusion "places upon an employer
an unsurmountable burden" of showing a "pattern of prior discipline
and absence of good behavior." Id. This Court disagrees.

     Use by a court of the absence of a pattern of negative
evaluations to conclude that a plaintiff met his or her job
expectations does not place upon an employer an "unsurmountable
burden." Said absence may be validly used as an indicator that an
employee was meeting job expectations. See Quevedo-Gaitan v. Sears
Roebuck de Puerto Rico, 536 F.Supp.2d 158, 170 (D.P.R. 2008). Other

Civil No. 06-1781 (JAG)                                              20

than the February warning there is a complete absence in the record
of any other disciplinary actions taken against the Plaintiff.
Furthermore, the Report and Recommendation did not conclude that
Plaintiff was meeting GSK's job expectations solely on the grounds
that there is an absence of negative employment history. As
discussed above, it also considered the proven history of
promotions, awards and recognitions.


3. <u>The Report and Recommendation erroneously concluded that there
are genuine issues of material facts</u>

     The Report and Recommendation concludes that there are issues
of material fact regarding: (1) whether Plaintiff was treated
differently than other younger managers; and, (2) whether GSK's
return to work policy was selectively implemented. (Docket No.
179, p. 27). GSK contends that even if the evidence regarding the
disparate treatment and the irregular implementation of the return
to work policy were true, said evidence is not enough to defeat its
Motion for Summary Judgment. (Docket No. 186, p. 10). This Court
disagrees.

     Regarding the disparate treatment, the Report and
Recommendation found that other Remediation Team leaders such as
Jennifer Alcover (approximately 32 years old), Erica Rivera
(approximately 32 years old) and Lorraine Torres (approximately 32
years old) were not disciplined even when they had CAPAs that were

older than TCR 0473. (Docket No. 179, p. 22). It also found that
many younger employees that had CAPAs assigned to them were not
disciplined (Docket No. 179, p. 22). The Report and Recommendation
found that this raised a genuine issue of material fact precluding
a Motion for Summary Judgment. Again, a fact is "material" if it
has the potential of changing the outcome of the suit under
governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). Whether in fact younger managers were not disciplined
is material because it may impact the final outcome of this suit
since the issue bears upon the question of whether Plaintiff was
treated differently because of his age.

Regarding the implementation of the return to work policy, the
Report and Recommendation found that Plaintiff had presented enough
evidence to raise a genuine issue of material fact as to whether
the return to work policy was always enforced and whether the way
it was enforced with respect to Plaintiff had to do with his age.
The question of whether the return to work policy was only enforced
against Plaintiff will bear on the final outcome of this suit and
therefore precludes GSK's Motion for Summary Judgment.

"[A]n employer would be entitled to judgment as a matter of
law if the record conclusively revealed some other,
nondiscriminatory reason for the employer's decision, or if
plaintiff created only a weak issue of fact as to whether the
employer's reason was untrue and there was abundant and

Civil No. 06-1781 (JAG)                                                22

uncontroverted evidence that no discrimination had occurred."
Zapata-Matos v. Reckit and Coleman, Inc., 277 F.3d 44 (1st Cir.
2002) (citing Reeves v. Sanderson Pluming Products, Inc., 530 U.S.
133 (2000)). In the present case this Court concurs with the Report
and Recommendation in finding that Plaintiff has created a
significant issue of fact precluding summary judgment. (Docket No.
179, p. 27)


4. The Report and Recommendation failed to apply and analyze the
correct pretext standard

     GSK argues that the Report and Recommendation did not apply
the correct pretext standard. (Docket No. 186, p. 11). This Court
cannot agree with GSK. The Report and Recommendation applied the
correct pretext standard. It correctly analyzed whether the reasons
for placing Plaintiff on probation and his subsequent discharge
were pretexts and whether the true reason is age discrimination.
(Docket No. 179, p. 19).

     The Report and Recommendation correctly applied Zapata-Matos
v. Reckit and Coleman, Inc., 277 F.3d 44 (1st Cir. 2002) to
establish that once GSK proffered what it believed to be
nondiscriminatory reasons for placing Plaintiff on probation and
for discharging him, the burden shifted back to Plaintiff to
establish through evidence that: (1) the reason was false; and, (2)
the real reason was based on age. The Report and Recommendation was

Civil No. 06-1781 (JAG)                                          23

also correct in pointing out that the same evidence used to
establish pretext can support a finding of discriminatory animus.
"[E]vidence showing that the employer's articulated reason is false
can be sufficient to overcome the third stage in the McDonnell
Douglas framework, but 'there can be no mechanical formula...
everything depends on the individual facts.'" Id. (citing Thomas v.
Eastman Kodak Co., 183 F.3d 38 (1st Cir. 1999)). As discussed in
the previous section, the Report and Recommendation found that
there are genuine issues of material fact in dispute regarding
whether Plaintiff was disciplined while younger managers were not
and whether the return to work policy was selectively applied to
the Plaintiff. These issues bear on the truthfulness of GSK's
articulated reasons and ultimately on the question of whether age
discrimination was the true reason.


5. The Report and Recommendation erroneously concluded that the
hostile work environment claim survived GSK's Motion for Summary
Judgment and that the Faragher/Ellerth defense is not available to
GSK

     GSK contends that the hostile work environment claim should
have been dismissed. It states that even assuming that the comments
made by Plaintiff's supervisors were suggestive of a bias against
"old employees," they were not pervasive or severe enough  to
constitute a hostile work environment. (Docket No. 186, p. 18). It

Civil No. 06-1781 (JAG)                                               24

alleges that Plaintiff failed to establish that the comments and
action were either severe, abusive, humiliating or physically
threatening. (Docket No. 186, p. 18). GSK fails to acknowledge that
courts, as the Report and Recommendation pointed out, must take
into account the totality of the circumstances. (Docket No. 179, p.
28). The circumstances include: (1) the frequency of the
discriminatory conduct; (2) its severity; (3) whether it is
threatening or humiliating; and, (4) whether it unreasonably
interferes with the employee's work performance. Marrero v.
Schindler Elevator Corp., 494 F.Supp.2d 102, 110 (D.P.R. 2007).

        The Report and Recommendation concluded that, if found to be
true, the comments made by Brandt and Vega were frequent enough (3
to 4 times a day) and severe enough that a rational fact finder
could see them as sufficient to sustain a hostile work environment
claim. (Docket No. 179, p. 30). This Court agrees with the Report
and Recommendation. A rational fact finder may conclude that
comments such as "old man, I am going to have to fire you," "you
are going to be fired because you are old," "old man, you are
behind schedule, I need new blood and you are old," if made
frequently enough may contribute to the creation of a hostile work
environment.

        This Court also agrees with the Report and Recommendation in
that the Faragher/Ellerth defense is unavailable to GSK. The
Faragher/Ellerth is not available "when a supervisor's harassment

Civil No. 06-1781 (JAG)                                               25

culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment." Faragher v. City of Boca Raton, 524 U.S. 807, 808 (1998); Burlington Indus. v. Ellerth, 524 U.S. 764, 765 (1998). GSK insists that Plaintiff was not terminated by the allegedly "harassing supervisor" but by Rodriguez, GSK's Human Resources Director. It then argues that the Faragher/Ellerth defense is available to it because the tangible employment action and the alleged harassment were carried out by two different persons. (Docket No. 186, p. 21).

There are two tangible and interconnected employment actions in this case: (1) the warning issued by Brandt that resulted in Plaintiff being placed on probation; and, (2) the termination which, according to GSK, was due to Plaintiff's entry into its facilities while on probation without going to the infirmary. The warning which resulted in Plaintiff being placed on probation was issued by Brandt who allegedly harassed Plaintiff and whose comments possibly contributed to the creation of a hostile work environment. Hence, it is clear that a tangible employment action taken by Brandt may be directly related to the harassment allegedly carried out by him. This Court agrees with the Report and Recommendation in that the availability of Faragher/Ellerth is barred.


6. The Report and Recommendation failed to dismiss the retaliation

Civil No. 06-1781 (JAG)                                          26

claim

    GSK contends that the Report and Recommendation erred in
finding a causal connection between the oral complaints made by
Plaintiff to Carloni and Ruiz at the end of 2005 and the warning.
It alleges that Plaintiff based his retaliation claim on the causal
nexus between the EEOC charge and his termination. It contends that
the connection between the oral complaints and the warning was
never pleaded and should not have been used to retain the
retaliation claim. (Docket No. 186, p. 22).

    As the Report and Recommendation correctly points out, in a
retaliation claim a plaintiff must show, by a preponderance of the
evidence, that there exists a causal connection between the adverse
employment action and a protected activity. Montalvo-León v. Wyeth
Pharmaceuticals Co., 2007 WL 2905350 (D.P.R. 2007)(citing Mesnick
v. General Electric Co., 950 F.2d 916 (1st Cir. 1991)). The Report
and Recommendation found that the decision to terminate Plaintiff
was taken in or around March 15, 2006. (Docket No. 179, p. 34). The
EEOC charge was filed by Plaintiff on March 24, 2006, which was
after the decision to terminate him was taken. No possible causal
nexus may be found between the protected activity (the filing of
the EEOC charge) and the adverse employment action (the
termination).

    A causal nexus was found, however, between the Plaintiff's
oral complaints to Carloni and Ruiz at the end of 2005 and the

Civil No. 06-1781 (JAG)                                              27

warning of February 1, 2006. These oral complaints took place less
than three months before the warning. The Report and Recommendation
found, and this Court concurs, that there was enough temporal
proximity between the complaints and the warning so that a causal
nexus may be found. (Docket No. 179, p. 36). Temporal proximity
does not, by itself, establish causation, "particularly when the
larger picture undercuts any claim of causation." Ramírez v.
Boehringer Ingeleim Pharmaceuticals, Inc., 425 F.3d 67, 83 (1st
Cir. 2005)(citing Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st
Cir. 2003)). This Court does not consider that the larger picture
undercuts any claim of retaliation. On the contrary, the record
suggests that Plaintiff was the only manager who was disciplined
with a warning for failure to comply with a deadline and that said
warning was less than three months after he complained about the
harassment. Consequently, this Court finds that the Report and
Recommendation is correct in refusing to dismiss the retaliation
claim.

Civil No. 06-1781 (JAG)                                                    28

## CONCLUSION

For the reasons stated above, this Court hereby **ADOPTS** the Magistrate Judge's Report and Recommendation. The pending Motion for Summary Judgment (Docket No. 53) is **DENIED.**

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 11th day of March, 2009.


                                        S/Jay A. García-Gregory
                                        JAY A. GARCIA-GREGORY
                                        United States District Judge